# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL ACTION NO. 3:25-CV-00796-KDB-WCM

RPG CO, LLC, ET AL.,

     **Plaintiffs,**

     v.

KENNETH MIDDLETON AND
ARC ENERGY SERVICES, INC.,

     **Defendants.**

<u>**MEMORANDUM AND ORDER**</u>

**THIS MATTER** is before the Court on Defendant Kenneth Middleton's Motion to Dismiss, or, in the Alternative to Stay and Compel Arbitration (Doc. No. 14), Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 18), and Defendant ARC Energy Services, Inc.'s ("ARC") Motion to Compel Arbitration (Doc. No. 34).[1] The Court has carefully considered these motions and the Parties' briefs and exhibits. For the reasons discussed below, the Court will **DENY** Mr. Middleton's motion to dismiss and Plaintiffs' Motion for a Preliminary Injunction and **GRANT** the Defendants' Motions to Compel Arbitration. This matter will be stayed pending the completion of the arbitration.

## I.     LEGAL STANDARDS

### A.     Motions to Compel Arbitration

The Federal Arbitration Act ("FAA") represents "a liberal federal policy favoring arbitration agreements" and applies "to any arbitration agreement within the coverage of the

---

[1] Having ordered a stay of these proceedings pending arbitration, the Court will deny as moot Plaintiffs' Motion to Expedite Discovery (Doc. No. 20) and Motions for Leave to File an Amended Complaint (Doc. Nos. 44, 51) and ARC's Motion to Dismiss (Doc. No. 32).

1

[FAA]." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Under Section 2 of the FAA, a written arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Furthermore, the Supreme Court has held that "courts must rigorously enforce arbitration agreements according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

In the Fourth Circuit, a litigant can compel arbitration under the FAA if he can demonstrate: "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) a relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of [a party] to arbitrate the dispute." *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 84 (4th Cir. 2016); *see also Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 563 (4th Cir. 2015). Agreements to arbitrate are construed according to ordinary rules of contract interpretation, as augmented by a federal policy requiring that all ambiguities be resolved in favor of arbitration. *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 710 (4th Cir. 2011). Whether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation. *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500-01 (4th Cir. 2002). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 81 (2000).

If the Court sends a case to arbitration, it must stay the case if either party requests it, assuming that there are no other reasons to dismiss unrelated to the fact an issue in the case is subject to arbitration. *See Smith v. Spizzirri*, 601 U.S. 472, 475-76 (2024). For example, where all the claims at issue in a lawsuit are arbitrable, but neither party has requested a stay, the court may

2

dismiss the lawsuit for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). *Wake Cnty. Bd. of Educ. v. Dow Roofing Sys., LLC*, 792 F. Supp. 2d 897, 900 (E.D.N.C. 2011); *see also Choice Hotels Intern.*, 252 F.3d at 709-10 ("[D]ismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable.").

Alternatively, where the claims at issue are arbitrable, but neither party has requested a stay, a court may choose to stay a lawsuit pending the parties' completion of arbitration. *See Silkworm Screen Printers, Inc. v. Abrams*, No. 91-1631, 1992 WL 317187, at *6 (4th Cir. Nov. 4, 1992) ("If the district court finds that [plaintiff] agreed to arbitrate ... it may either dismiss [plaintiff's] complaint for lack of subject matter jurisdiction or stay its proceedings pending arbitration and consideration of the award pursuant to Article V of the Convention.").

### B.       Preliminary Injunctions

The Fourth Circuit Court of Appeals' familiar four-factor test for granting a preliminary injunction from *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) sets a "high bar." *See Am. Fed'n of Tchrs. v. Bessent*, 152 F. 4th 162, 169 (4th Cir. 2025). A district court may only grant a preliminary injunction if it determines that the plaintiff has shown (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that the injunction is in the public interest. *Id.*

While movants "need not show a certainty of success," *Pashby v. Delia,* 709 F.3d 307, 321 (4th Cir. 2013), in *Bessent* the court explained the uphill battle that a party seeking a preliminary injunction faces:

> In and since *Winter*, the Supreme Court has repeatedly admonished lower courts that a preliminary injunction "is an extraordinary remedy never awarded as of right." *Id.* at 24, 129 S.Ct. 365; *see Benisek v. Lamone*, 585 U.S. 155, 158, 138 S.Ct. 1942, 201 L.Ed.2d 398 (2018) ("extraordinary remedy"); *Starbucks Corp. v.*

> *McKinney*, 602 U.S. 339, 345–46, 144 S.Ct. 1570, 219 L.Ed.2d 99 (2024) ("'extraordinary' equitable remedy"). Far from a mainstay in the ordinary course of litigation, a preliminary injunction is "extraordinary and drastic" and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (quoting 11A Wright & Miller's Federal Practice & Procedure § 2948 (2d ed. 1995)). As a result, granting a preliminary injunction should be "the exception," not "the rule." *Munaf*, 553 U.S. at 690, 128 S.Ct. 2207.

*Id*.

Further, "a preliminary injunction can be granted only if every factor is met, [y]et *denying* a preliminary injunction only takes the rejection of a single factor." *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 544 (4th Cir. 2023); *see also Henderson for NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) ("*Winter* made clear that *each* of these four factors must be satisfied to obtain preliminary injunctive relief."). Thus, a court need not consider all four *Winter* factors when denying—but only when denying—a preliminary injunction. Indeed, "Plaintiffs face what can be called a 'multiplicative problem.' Their likelihood of success overall is the product of their probability of success on each of the independent, dispositive issues. And as probabilities are multiplied, their product shrinks rapidly." *Bessent*, 152 F.4th at 170. Thus, a "plaintiff must … show an extremely high likelihood of success on each individual issue in order to have a normal likelihood of success overall—otherwise, the product of the probabilities will be too low. *Id*.

Ultimately, the issuance of a preliminary injunction remains within the discretion of the Court upon application of the four factors. *See Winter,* 555 U.S. at 22, 24, 32 (noting that even issuance of a permanent injunction after trial "is a matter of equitable discretion; it does not follow from success on the merits as a matter of right.").

## II. FACTS AND PROCEDURAL HISTORY

Plaintiff RPG is the parent and holding company of Riley Power Group and Great American Welding Company ("GAWCO"). (Doc. No. 1, ¶ 4). Riley Power Group is a full-service maintenance and capital construction company, specializing in mechanical, welding, and electrical services for a broad range of industries, including power generation, defense, and various industrial sectors. GAWCO is the union arm of Riley Power Group and supplies a highly trained and specialized union workforce. (*Id.*, ¶¶ 13-14). Plaintiffs allege that they provide their services nationwide with customers across the United States; however, they also allege that the pool of potential customers is relatively limited because of the highly technical nature of the work. (*Id.*, ¶ 17).

In February 2018, Plaintiffs hired Kenneth Middleton as the Vice President of Operations of Riley Power Group and GAWCO. (*Id.*, ¶ 19). In this role, Middleton was responsible for overseeing all operations of Riley Power Group and GAWCO. (*Id.*, at ¶ 20). Plaintiffs allege that Middleton had substantial and material contact with each of the customers of Riley Power Group and GAWCO, was responsible for producing rate sheets for customers, and was the ultimate supervisor of all subordinate employees of Riley Power Group and GAWCO. He also had access to Plaintiffs' confidential and trade secret information. (*Id.*). In turn, Middleton states that he is a welding industry veteran, having worked in the industry for 35 years, with 17 at the executive level. (Doc. No. 38, ¶ 14.) Consistent with that experience, he alleges that before he started to work for the Plaintiffs, he had full knowledge of the customers, bidding processes, etc. in the industry. (*Id.*).

When Middleton was hired, he signed a document titled "Employment Agreement" drafted by Plaintiffs (the "Employment Agreement"). (Doc. No. 22 at Ex. A). The copy of the Employment

5

Agreement maintained in Plaintiffs' records is not signed by the company, and no copy executed by Plaintiffs has otherwise been presented to the Court. (*See* Doc. No. 46-1 at Ex. C). The primary focus of this dispute are the agreement's non-competition, non-solicitation and confidentiality provisions:

6. <u>Non-Competition; Non-Solicitation; Confidentiality; Company Property</u>.

(a) Non-Competition. For the purposes of this Section 6, the **"Restricted Period"** shall consist of the Employee's Term of Employment and a period of thirty-six (36) months thereafter, except as otherwise provided herein…. Employee covenants and agrees that during the Restricted Period, Employee shall not, in the United States, directly or indirectly (i) engage in any element of the Business (other than for the Company or its affiliates) or otherwise compete with the Company or its affiliates, (ii) render any services to any person, corporation, partnership or other entity (other than the Company or its affiliates) engaged in any element of the Business, or (iii) become interested in any such person, corporation, partnership or other entity (other than the Company or its affiliates) as a partner, shareholder, principal, agent, employee, consultant or in any other relationship or capacity; … For purposes of this Agreement, the term **"Business"** shall mean the business of welding, including without limitation the staffing and training of welders at industrial, commercial, governmental, military and other job and project sites and all other related business in which the Company engages in as of the date hereof and thereafter during the Term of Employment. …

(b) Non-Solicitation. During the Restricted Period, the Employee shall not, without the Company's prior written consent, directly or indirectly, (i) solicit or encourage to leave the employment or other services of the Company, or any of its affiliates, any employee or independent contractor thereof (or was an employee or independent contractor within two (2) years of Employee ceasing to be employed by the Company), or (ii) hire (on behalf of the Employee or any other person or entity) any employee or independent contractor who has left the employment or other services of the Company or any of its affiliates within the one-year period which follows the termination of such employee's or independent contractor's employment or other services with the Company and its affiliates. During the Restricted Period, the Employee shall not, whether for his own account or for the account of any other person, firm, corporation or other business organization, intentionally interfere with the Company's or any of its affiliates' relationship with, or endeavor to entice away from the Company or any of its affiliates, any person who, during the Term of Employment, is or was a customer or client of the Company or any of its affiliates.

(c) Confidentiality. From and after the date hereof, the Employee shall keep secret and retain in strictest confidence, and shall not use for his benefit or the

6

benefit of others, except in connection with the business and affairs of the Company and its affiliates, all confidential matters relating to the Company's Business and the business of any of its affiliates, and to the Company and any of its affiliates, learned by the Employee heretofore or hereafter directly or indirectly from the Company or any of its affiliates (the "**Confidential Company Information**"), including, without limitation, financial and other information with respect to customers, clients, suppliers, sources of supply and customer lists; and shall not disclose such Confidential Company Information to anyone outside of the Company except with the Company's express written consent, and except for Confidential Company Information which is at the time of receipt or thereafter becomes publicly known through no wrongful act of the Employee, or is received (without breach of this Agreement) from a third party not under an obligation to keep such information confidential.

*Id*.

The Employment Agreement also contains a "Dispute Resolution" provision, which is the basis of the Defendants' motions to compel arbitration:

7.1. <u>Dispute Resolution</u>.

(a) Except as provided in Section 7.2(c), in the event of any dispute, controversy or claim arising out of or related to this Agreement or a breach hereof, including its interpretation, scope, formation, performance or termination ("Dispute"), the Parties shall settle such Dispute in accordance with the following:

(i) <u>Friendly Discussions</u>. The Parties shall first use commercially reasonable efforts to settle the Dispute by consulting and negotiating with each other in good faith to reach a just and equitable solution satisfactory to all Parties;

(ii) <u>Mediation</u>. If no settlement is reached within thirty (30) days after one Party notifies the other Party of the existence of the Dispute, the Parties shall attempt to resolve the Dispute by a one-day mediation administered by the American Arbitration Association (the "AAA") under the AAA's Commercial Mediation Rules; and then

(iii) <u>Arbitration</u>. If the Dispute is not resolved through a one-day mediation, the Dispute shall be finally resolved by arbitration administered by the AAA in accordance with the provisions of Section 7.1(b) and the AAA's then-current Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.
…

(c) Notwithstanding anything contained in this Section 7 to the contrary, each Party shall have the right to institute judicial proceedings against another Party or anyone acting by, through or under such other Party, in order to enforce the instituting Party's rights hereunder through reformation of contract, specific performance, injunction or similar equitable relief.

On August 16, 2021, Middleton was promoted to President of Riley Power Group and GAWCO, where he also allegedly maintained substantial and material contact with the customers and employees of Riley Power Group and GAWCO. (Doc. No. 1, ¶ 29.) Plaintiffs further allege that in "June of 2023," Middleton took on a greater leadership role within the RPG parent company with greater responsibility and authority over RPG's entire operations. (*Id*., ¶ 30.) However, his title of President did not change, and Plaintiffs do not contend that he received any additional compensation or other benefits in consideration for his additional duties.

On June 28, 2023, Middleton and RPG executed a Non-Solicitation and Confidentiality Agreement with RPG. (the "Covenants Agreement"). (Doc. No. 46-1 at Ex. A). The Covenants Agreement states that the consideration for Middleton's promises is his "employment" as stated in the agreement ("RPG has offered Employee a position of employment as a(n) President…") and contains numerous non-solicitation obligations related to customers and prospective customers as well as employees. (Doc. No. 22 at Ex. B). Further, the Covenant Agreement includes a number of provisions related to the non-disclosure of Proprietary Information and Trade Secrets, as broadly defined in the agreement. (*Id*.).

Specifically, Section 9.1 of the Covenants Agreement requires that Middleton not "directly or indirectly," for a period of two (2) years after his employment ended, "solicit or accept any business related or similar to RPG's Business from any person or entity who or which was or is a Customer during Employee's employment with RPG,"; "solicit or accept any business related or similar to RPG's Business from any person or entity who or which was or is a Prospective

8

Customer with whom or which Employee had or has had contact by virtue of Employee's employment with RPG during Employee's employment with RPG during the twenty-four (24) months immediately preceding the termination of Employee's employment with RPG (a "Marketed Prospective Customer")"; or "divert or attempt to divert a Customer or, if Employee's employment with RPG has terminated, divert, or attempt to divert any Serviced Customer to any person or entity competitive in the Business with RPG." (*Id.*, 9.1.). Section 9.2 of the Covenants Agreement further provides that Middleton would not "directly or indirectly," for a period of one (1) year after his employment ended, "accept, conduct, engage in, solicit, attempt to solicit or assist in soliciting the employment in a business competitive with the Business of RPG of any person employed by RPG as of the date the Employee's employment relationship is terminated." (*Id.*, 9.2.)

On March 27, 2025, Middleton resigned from his employment with RPG, effective April 11, 2025. (Doc. No. 1, ¶39). Following his resignation, Middleton began working in April 2025 as an Executive Vice President of ARC. (*Id.*, at ¶ 41). Plaintiffs broadly accuse Middleton of taking Plaintiffs' confidential client information, but have not specified the information taken or how or when it was taken. Rather, the Complaint lists general categories of information (i.e. "client names, telephone numbers, email addresses, and other contact information," pricing information, etc.), at least some of which appears to be non-proprietary and publicly available in a small industry, although Plaintiffs allege otherwise. (*See id.*, ¶ 43.) They also allege that beginning in May 2025, Middleton and ARC used Plaintiffs' confidential information to bid against Plaintiffs and obtain work from several prospective customers. (*Id.*, ¶46). Plaintiffs further allege that Middleton solicited several other RPG employees to go to work for ARC. (*Id.*, at ¶ 49).

In Middleton's telling, he was dissatisfied with his job with Riley Power Group and gave notice of his resignation in March 2025, beginning work in April 2025 for ARC. (Doc. No. 38, ¶

9

16). Middleton states that he did not remove any records or take any proprietary information about Plaintiffs' business with him, nor did he provide any records or proprietary information or confidential information to ARC, including client names, telephone numbers, email addresses, other contact information, or pricing or contract information. (*Id*.) Rather, he alleges that ARC has been in business for over 15 years and already possessed all of the customer information. (*Id*.) Also, Middleton explains that Plaintiffs', ARC's and their competitiors' customers are in regulated industries (power generation, military, etc.), and the bidding process for jobs is competitive and qualification requirements are very strict. (*Id*., ¶ 21.) Every project has multiple competitors seeking to get the work if they are qualified, and the specifications and scopes of work vary for each project. (*Id*.) Most projects receive multiple bids, and a decision is made by the customer based on its needs, the bids it receives, and a multitude of factors. Middleton says that ARC and the Plaintiffs have been competing for these projects for years, along with other competitors, and that has continued after Middleton joined ARC. (*Id*.)

After working for ARC for nearly five months, Middleton received a letter on August 27, 2025, from Plaintiffs' counsel asking him to cease and desist from working for ARC, using confidential information, etc. Defendants responded, asking for copies of the relevant agreements, which were allegedly not provided. (*Id*., ¶ 17). Ultimately, Defendants did not agree with Plaintiffs' demands, and this action was filed on October 14, 2025. Plaintiffs assert claims for breach of contract (both the Employment Agreement and Covenants Agreement), breach of the covenant of good faith and fair dealing, tortious interference with contractual relations (against both Middleton and ARC), unfair trade practices under N.C. Gen. Stat. § 75-1.1 et seq., punitive damages and breach of fiduciary duty. The Complaint alleges that Defendants' unlawful conduct has caused Plaintiffs damages "totaling millions of dollars" and further seeks temporary,

preliminary and permanent injunctive relief, along with fees, costs and "such other and further relief" to which Plaintiffs are entitled. (Doc. No. 1 at ¶ 50, pp. 15-16).

On December 4, 2025, almost two months after the Complaint was filed and after Middleton had filed a motion to dismiss and sought to arbitrate the dispute, Plaintiffs filed a Motion for Preliminary Injunction and Motion to Expedite Discovery. (Doc. Nos. 14, 18). ARC's motions to dismiss and compel arbitration followed later in December. (Doc. Nos. 32, 34). Finally, in late January 2026, Plaintiffs filed a motion and amended motion seeking to file an Amended Complaint, which adds additional factual allegations related to the same contracts, but maintains the same causes of action. (*See* Doc. Nos. 44, 51). All motions have been fully briefed and are ripe for the Court's ruling.

## III.   DISCUSSION

### A.   Motion to Dismiss

Middleton's motion to dismiss, filed November 25, 2025, asks the Court to dismiss the claims against him based on Plaintiffs' alleged failure to properly serve process. Whatever the merits of the motion as of that date, Plaintiffs subsequently filed an affidavit of service, stating that a process server personally served Middleton with a copy of the Summons and Complaint on December 1, 2025. Doc. No. 17. Middleton has not filed a Reply in support of his motion to dismiss nor has he otherwise challenged the affidavit of personal service. In the absence of an objection to that evidence of personal service, the Court finds that Middleton has been properly served, and the Court has personal jurisdiction over Middleton. Therefore, his motion to dismiss for improper service will be denied.

### B. Motions to Compel Arbitration

Both Defendants have moved to compel arbitration, and under the well-established law supporting arbitration agreements, the Court finds that at least a significant portion of the Parties' dispute must be resolved in arbitration. *See Kendall v. Reg'l Enters., LLC*, No. 5:24-CV-00180-KDB-SCR, 2024 WL 4375792, at *1 (W.D.N.C. Oct. 2, 2024). As described above, there can be no dispute that, to the extent it was fully executed and enforceable,[2] Middleton's Employment Agreement contains an arbitration provision. Thus, the remaining issue for the Court is whether the Plaintiffs' claims are arbitrable under the terms of the agreement, with due regard for the federal policy requiring that all ambiguities be resolved in favor of arbitration. *See Choice Hotels,* 252 F.3d at 710.

Contrary to Plaintiffs' characterization, the Employment Agreement's arbitration provision has a broad scope,[3] encompassing "any dispute, controversy or claim arising out of or related to this Agreement or a breach hereof, including its interpretation, scope, formation, performance or termination…." Plainly, all of Plaintiffs' factual allegations reflect a dispute arising out of or related to an alleged breach of the Employment Agreement's restrictions on competition, etc., even if some of the claims are not specifically directed to a violation of that agreement. Therefore, the Court finds that the Parties' dispute is arbitrable, subject to the limited exception discussed below.

---

[2] Middleton has challenged the existence of an enforceable employment agreement based on the lack of a signature by Plaintiffs on the document and related allegations that Plaintiffs did not honor the terms of the Employment Agreement, which could suggest the absence of a meeting of the minds (or the failure of the promised consideration for the restrictions on competition). In any event, the Court does not reach that issue, which will be left to the arbitrator, who is tasked with ruling on disputes over the "formation" of the agreement, in addition to issues related to Middleton's alleged breach.

[3] Indeed, Plaintiffs' briefs invert an accurate description of the scope of the arbitration provision, arguing in effect that the narrow "injunction" exception overrides the broad scope of the agreement to "discuss, mediate and arbitrate" the Parties' disputes.

As emphasized by Plaintiffs, the Employment Agreement contains an exception that permits a party to seek equitable relief, including an injunction, to enforce rights under the agreement. Doc. No. 22, ¶7.1(c). However, most fairly read, that provision is intended to allow a party, as Plaintiffs have done here, to seek injunctive relief pending the completion of an arbitration, not to fully supplant it. Therefore, the Court, with due regard for the preferential position of arbitration, will honor both the Parties' broad arbitration provision and its exception by granting the motion to compel arbitration, fully considering Plaintiffs' motion for a preliminary injunction in this Order and then staying this matter pending the Parties' arbitration.

### C. Motion for Preliminary Injunction

Plaintiffs' motion for a preliminary injunction asks the Court to significantly alter the status quo, prohibiting Middleton from continuing to work for ARC and effectively ending his ability to work in the industry in which he has worked for decades through the broad customer restriction Plaintiffs request. For several reasons, Plaintiffs have not made the required "clear showing" that all four *Winter* requirements are satisfied. *See Pashby*, 709 F.3d at 320. Although a court need not address all four *Winter* factors if one or more of those factors is not satisfied, the Court will discuss why Plaintiffs have failed to establish both the likelihood of success on the merits and immediate irreparable harm, either of which independently would lead to denial of Plaintiffs' motion. *See Henderson,* 902 F.3d at 439; *Roswell v. Mayor & City Council of Baltimore*, 671 F. Supp. 3d 607, 616 (D. Md. 2023), *aff'd,* No. 23-1567, 2023 WL 8728503 (4th Cir. Dec. 19, 2023). It need not reach or decide the remaining two factors, the balancing of harms and the public interest.

### 1. Likelihood of Success

A Plaintiff seeking a preliminary injunction "need not establish a certainty of success but must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d

224, 230 (4th Cir. 2017) (internal quotation marks omitted). "While it is [the] Plaintiff['s] burden, as the movant[ ], to make a showing sufficient to justify a preliminary injunction, 'the burdens at the preliminary injunction stage track the burdens at trial.'" *Microban Int'l, Ltd. v. Kennedy*, No. 322CV00620KDBDSC, 2023 WL 2533085, at *3 (W.D.N.C. Mar. 15, 2023). "When considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence presented by the parties and is not required to resolve factual disputes in favor of the non-moving party." *Queen Virgin Remy, Co. v. Thomason*, No. 1:15-cv-1638-SCJ, 2015 WL 11422300, at *2 (N.D. Ga. June 10, 2015) (citing *Imaging Bus. Machs., LLC v. BancTec, Inc.*, 459 F.3d 1186, 1192 (11th Cir. 2006)).

In resolving contested allegations, the court must "assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications." *Weaver v. Henderson*, 984 F.2d 11, 14 (1st Cir. 1993) (quoting *Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 933 (1st Cir. 1988)). At a preliminary injunction stage, allegations set forth in a verified complaint are treated the same as affidavits. *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 542 (7th Cir. 1998) ("[v]erified complaints [are] the equivalent of affidavits"); *Synthes USA, LLC v. Davis*, No. 4:17-cv-02879-RBH, 2017 WL 5972705, at *1 n.2 (D.S.C. Dec. 1, 2017) (explaining that "a verified complaint is wholly sufficient for purposes of ruling on a preliminary injunction motion.") (citation omitted). The success of Plaintiffs' claims depend on the enforceability of the restrictive covenants in the two alleged agreements. Even assuming both the Employment Agreement and Covenant Agreement were properly executed by the Parties, the Court finds Plaintiffs are not likely to succeed in proving either is enforceable as to its restrictions on competition.

In modern law, covenants not to compete between an employer and employee are not viewed favorably, *Clinical Staffing, Inc. v. Worldwide Travel Staffing Ltd.*, 60 F. Supp. 3d 618, 623 (E.D.N.C. 2013) (citations omitted), including in North Carolina. *NovaQuest Capital Mgmt., L.L.C. v. Bullard*, 498 F. Supp. 3d 820, 830 (E.D.N.C. 2020) (quoting *RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 196 (4th Cir. 2016)). The party who seeks to enforce a noncompete covenant has the burden to prove that the covenant is reasonable. *See, e.g., Kadis v. Britt*, 224 N.C. 154, 158 (1944). In North Carolina, courts will only enforce a covenant not to compete if it is: "(1) in writing; (2) reasonable as to [its] terms, time, and territory; (3) made a part of the employment contract; (4) based on valuable consideration; and (5) not against public policy." *FlagCo, LLC v. Winstead*, No. 5:23-CV-172-D, 2023 WL 7288046, at *6 (E.D.N.C. Nov. 3, 2023), *recon. denied*, 716 F. Supp. 3d 404 (E.D.N.C. 2024) (quoting *Triangle Leasing Co., Inc. v. McMahon*, 327 N.C. 224, 228 (1990)).

Here, both agreements are in writing and made a part of purported employment contracts. The remaining requirements are in dispute. "The reasonableness of a noncompetition covenant is a matter of law for the court to decide." *Hartman v. W.H. Odell & Associates, Inc.*, 117 N.C. App. 307, 311 (1994) (quoting *Beasley v. Banks*, 90 N.C. App. 458, 460 (1988)) (citations omitted). "To be valid, the restrictions must be no wider in scope than is necessary to protect the business of the employer." *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 656 (2009) (citation omitted).

"When considering the enforceability of a covenant not to compete, a court examines the reasonableness of its time and geographic restrictions, balancing the substantial right of the employee to work with that of the employer to protect its legitimate business interests." *Atkore Int'l, Inc. v. Dinkheller*, No. 24CV022644-400, 2025 WL 1087037, at *6 (N.C. Super. Apr. 10,

2025) (quoting *Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 86 (2007)). The court considers "time and geographic limitations in tandem." *Worldwide Travel Staffing Ltd.*, 60 F. Supp. 3d at 624 (citing *Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 665 (1968)). "Generally, the shorter the time period in the covenant not to compete, the larger the geographic restriction may be." *Id.* (citing *id.*). "Likewise, the longer the time period in the covenant not to compete, the smaller the geographic restriction must be." *Id.* Here, the Court finds that Plaintiffs are unlikely to prove the competitive restrictions are reasonable as to time and territory.

In the Employment Agreement, the purported competition restrictions extend throughout the United States, which Plaintiffs contend is the scope of their business, but which covers the entire small industry in which they compete. Given the breadth of that territory, only a relatively short time period might be reasonable. However, the time period of the restrictions is quite long, extending three years for the covenant not to compete, and even longer – four to ten years when considering the "look-back" provisions – for the non-solicitation, non-hiring, and customer restrictions. *See Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 280-81 (2000). ("[W]hen a non-compete agreement reaches back to include clients of the employer during some period in the past, that look-back period must be added to the restrictive period to determine the real scope of the time limitation."). Therefore, the time and territory restrictions in the Employment Agreement are unreasonable in the context of a small industry in which customers are readily identified and numerous competitors engage in project by project competitive bidding, which suggests that any legitimate restrictions based on specific company knowledge (as distinguished from general industry knowledge) need not be lengthy.

Further, North Carolina law does not allow an employer to use a noncompete covenant "to prevent an employee from working for a competitor in *any* capacity," *FlagCo*, 2023 WL 7288046,

at \*8 (citing *Henley Paper Co. v. McAllister*, 253 N.C. 529, 531–35 (1960)) (citations omitted) (emphasis added), and courts have held that "restrictive covenants are unenforceable where they prohibit the employee from engaging in future work that is distinct from the duties actually performed by the employee." *Id.*; *see Copypro, Inc. v. Musgrove*, 232 N.C. App. 194, 200 (2014) ("[W]e have held on numerous occasions that covenants restricting an employee from working in a capacity unrelated to that in which he or she worked for the employer are generally overbroad and unenforceable."); *Hartman*, 117 N.C. App. at 317 (finding a covenant unenforceable where it "would appear to prevent plaintiff from working as a custodian for any 'entity' which provides 'actuarial services' "). The restrictions in the Employment Agreement are thus impermissibly broad, prohibiting Middleton from "directly or indirectly (i) engag[ing] in any element of the Business," "(ii) render[ing] any services" to anyone "engaged in any element of the Business," or "(iii) becom[ing] interested in any such person" rather than limiting his restrictions to track his employment duties.

Plaintiffs argue that the Court can simply blue-pencil the restrictions to make them reasonable. The Court disagrees. A court applying North Carolina's strict blue-pencil law "at most may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable. It may not otherwise revise or rewrite the covenant." *Hartman*, 117 N.C. App. at 317; *cf. Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528 (1989) ("The courts will not rewrite a contract if it is too broad but will simply not enforce it."). Most simply put, where, as here, the Plaintiffs have drafted non-competition restrictions best described as prohibiting doing "anything with anyone for a long time in a small industry," the Court will decline the invitation to rewrite and enforce a reasonable set of restrictions. *See XPO, Inc. v. Byrd*, No. 3:25-CV-00243-KDB-DCK, 2025 WL 2557708, at \*4–7 (W.D.N.C. June 11, 2025).

Finally, the Court need not separately address the reasonableness of the restrictions in the Covenants Agreement (which are also quite broad) because that agreement fails at the threshold factor of consideration. Under North Carolina law, new consideration in addition to continued employment is required to support new restrictions on competition. "[W]hen the relationship of employer and employee is already established without a restrictive covenant, any agreement thereafter not to compete must be in the nature of a new contract based upon a new consideration." *James C. Greene Co. v. Kelley*, 261 N.C. 166, 168 (1964). Middleton began working for Plaintiffs in 2018 and was promoted to President in 2021. The Covenants Agreement – which was not executed until June 2023 – states that the consideration to support it is an offer of employment as President, which occurred nearly two years before and thus cannot be "new" consideration. Doc. No. 22 at Ex. B.[4] Accordingly, the Covenants Agreement lacks consideration and Plaintiffs are unlikely to succeed in enforcing its restrictions. *See James C. Greene Co.*, 261 N.C. at 169 (finding that "[t]he new contract with the restrictive covenant was without consideration—hence invalid" where the employee had been employed for approximately one year prior to signing the agreement); *Milner Airco, Inc. of Charlotte, NC v. Morris*, 111 N.C.App. 866 (N.C. App. 1993) (if an employment relationship already exists, a non-compete must be based on new consideration).

In sum, Plaintiffs have not shown a likelihood of success on their claims.

**2.      Irreparable Harm**

The Court also finds that Plaintiffs have not shown the immediate irreparable harm necessary to support a preliminary injunction. In analyzing the irreparable harm requirement, the

---

[4] Plaintiffs contend that Middleton took on additional responsibilities as President in June 2023; however, requiring an employee to perform additional tasks without additional compensation or benefits cannot supply consideration to the employee for new restrictions on his ability to compete in the future.

Court first considers whether the moving party exhibited "reasonable diligence" in seeking an injunction. *Benisek v. Lamone*, 585 U.S. 155 (2018). In other words, because "an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (quoting *Skehan v. Bd. of Trs. of Bloomsburg State Coll.*, 353 F. Supp. 542, 543 (M.D. Pa. 1973)); *see also Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985) ("Lack of diligence, standing alone, may ... preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm."); *Potomac Heritage Trail Ass'n, Inc. v. U.S. Dep't of Transp.*, No. CV DLB-22-2482, 2022 WL 7051160, at *18 (D. Md. Oct. 11, 2022) ("The plaintiffs' delay in seeking injunctive relief undermines their claims of irreparable injury.").

In *Quince*, the United States Court of Appeals for the Fourth Circuit upheld the district court's denial of a preliminary injunction where the plaintiffs waited nine months to pursue an injunction. *See generally Quince*, 872 F.2d 75. Similarly, Plaintiffs waited approximately five months until August 2025 to communicate any complaint to Middleton after he began working for ARC in April 2025. This action was not filed until October 2025, and Plaintiffs' Preliminary Injunction Motion was filed in December 2025, eight months after Middleton began working for ARC. No reason for this unhurried timing is proffered by Plaintiffs. Therefore, as to all of Plaintiffs' claims, the delay in seeking injunctive relief precludes the Court from concluding that Plaintiffs have clearly established the immediate irreparable harm required to issue a preliminary injunction. *See Roswell*, 671 F. Supp. 3d at 618.[5]

---

[5] Additionally, the *Quince* Court noted that a delay in seeking relief was "quite relevant to balancing the parties' potential harms," thereby implicating the third *Winter* factor. *Quince*, 872

## II. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendant Kenneth Middleton's Motion to Dismiss, or, in the Alternative to Stay and Compel Arbitration (Doc. No. 14) is **DENIED** as to the Motion to Dismiss but **GRANTED** as to the Motion to Compel Arbitration**;**

2. Defendant ARC Energy Services, Inc.'s Motion to Compel Arbitration (Doc. No. 34) is **GRANTED;**

3. Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 18) is **DENIED**;

4. Plaintiffs' Motion to Expedite Discovery (Doc. No. 20) and Motions for Leave to File an Amended Complaint (Doc. Nos. 44, 51) and ARC's Motion to Dismiss (Doc. No. 32) are **DENIED** as moot; and

5. This matter is **STAYED** pending the Parties conducting a mediation and arbitration in accordance with the provisions of the Employment Agreement described above.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: March 30, 2026

Kenneth D. Bell
United States District Judge

---

F.2d at 80; Perry v. Judd, 471 F. App'x 219, 224 (4th Cir. 2012) ("For 'equity ministers to the vigilant, not to those who sleep upon their rights.'").

20